**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

---

| | |
|---|---|
| SANTA VELEZ | : |
| | : |
| Plaintiff, | :    Civil No. 12-7592 (RBK) |
| | : |
| v. | :    **OPINION** |
| | : |
| CAROLYN W. COLVIN, Acting | : |
| Commissioner of Social Security, | : |
| | : |
| Defendant. | : |

---

**KUGLER**, United States District Judge:

This matter comes before the Court on the appeal filed by Plaintiff Santa Velez from the

decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff

disability insurance benefits ("DIB") and supplemental security income ("SSI") pursuant to

Section 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g).  For the reasons

expressed below, the Court will vacate the Commissioner's decision that Plaintiff is not entitled

to DIB and SSI, and remand the matter to the Administrative Law Judge ("ALJ").

**I.    BACKGROUND**

**A.  Procedural History**

On December 4, 2006, Plaintiff filed applications with the Social Security Administration

(the "Administration") for DIB and SSI, alleging that she became disabled on June 1, 2005.  Tr.

188-99.[1]  Plaintiff alleged disability due to back and neck problems, a knee injury, depression,

---

[1] The Court notes that the ALJ Decision of June 10, 2010 lists the filing date of Plaintiff's claim as November 8, 2006 (Tr. 73).  The Court assumes that the correct date for Plaintiff's Applications for DIB and SSI is the date listed on the Applications themselves—December 4, 2006.  Tr. 188, 196.

and osteoporosis.  Tr. 223.  Plaintiff's claim was denied on April 25, 2007.  Tr. 91-96.  Plaintiff's

claim was denied again on reconsideration on August 20, 2008. Tr. 101-06.  Thereafter, Plaintiff

requested a hearing before an Administrative Law Judge ("ALJ").  Tr. 107-09.  On April 14,

2010, Plaintiff appeared before ALJ Joseph Hillegas.  Tr. 73.  On June 10, 2010, the ALJ found

that Plaintiff was not disabled within the meaning of the Social Security Act at any time between

Plaintiff's alleged disability onset date of June 1, 2005 and the date of the ALJ's decision.  Tr.

73-80.  Plaintiff then sought review of the ALJ's decision by the Appeals Counsel, which

vacated the ALJ's decision and remanded the case with instructions to make additional findings

on May 9, 2011.  Tr. 86-90.  On remand, Plaintiff again appeared before ALJ Hillegas on July

15, 2011.  Tr. 44-65.  On September 15, 2011, the ALJ again found that that Plaintiff was not

disabled within the meaning of the Social Security Act.  Tr. 10-19.  The Appeals Council denied

Plaintiff's request for review of this decision by the ALJ on October 17, 2012.  Tr. 1.  Plaintiff

then filed this action on December 12, 2012, seeking district court review of the ALJ's decision.

### B.  Plaintiff's Physical Condition and Medical History

Plaintiff's alleged disability is caused by depression and anxiety, as well as various

physiological disorders.  The Court describes her impairments to the extent necessary for this

Opinion.

The record indicates that in 2004, Plaintiff began treatment with Dr. Jatin Gandhi, an

orthopedist, for back pain, hip pain, and other orthopedic complaints.  Tr. 14, 327-38.  In 2005,

Plaintiff was referred by Dr. Gandhi to Dr. Sharan Rampal, a neurologist, for severe low back

pain radiating into her hips, accompanied by tingling and numbness.  Tr. 14, 311.  An MRI

showed that Plaintiff had a bulging disc in her lumbar spine.  Tr. 350.  On July 25, 2005, Dr.

Rampal gave her a lumbar epidural injection to alleviate her pain. Tr. 310. On September 19, 2005, Plaintiff received a sacroiliac block injection in a further attempt to relieve the pain. Tr. 306. Dr. Rampal also recommended an additional epidural injection to the lumbar spine for this condition. Tr. 306-07. Records show that Plaintiff also treated for a right knee injury that she sustained in a fall in a supermarket in 2006. Tr. 383. She received an MRI of the knee, which was read as "essentially unremarkable," except for a "subtle tear of the posterior horn of the medial meniscus." Tr. 341. In October, 2006, Plaintiff underwent arthroscopic debridement surgery for the knee condition. Tr. 359.

Plaintiff also sought treatment with Dr. Stephen Soloway starting in June, 2007, for decreased range of motion in her elbows, wrists and knees, as well as left hip and bilateral hand pain. Tr. 453-61. Dr. Soloway found that she had seronegative rheumatoid arthritis, osteoarthritis of the knees, hips, hands, wrist, feet and ankles, cervical and lumbar disc disease, osteoporosis, and accelerated bone loss. Tr. 453. Dr. Soloway subsequently administered injections in an effort to treat Plaintiff's symptoms. Tr. 454. Plaintiff also has been diagnosed with hypertension and diabetes. Tr. 453.

Plaintiff was evaluated by Dr. Khona Nithyashuba on March 15, 2007, at the request of the Division of Disability Determination Services of the New Jersey Department of Labor. Tr. 409. Dr. Nithyashuba noted her complaints related to her neck, back and knees, as well as her history of the epidural injection and knee surgery. Tr. 409. He also recorded that she complained of depression since 2005 and that she stated that she "sleeps all the time and she is tearful all the time." Tr. 409. Dr. Nithyashuba's diagnoses were degenerative joint disease of the back and knee,

depression, and osteoporosis. He indicated "minimal findings during this examination with most subjective complaints of pain." Tr. 411.

Dr. Isabella Rampello, a state agency medical consultant, subsequently reviewed Plaintiff's medical records upon request of the Administration, and completed a Physical Residual Functional Capacity ("RFC") Assessment. Tr. 438. She found that Plaintiff could sit for about six hours in an eight-hour workday, and stand or walk for about six hours. Tr. 439. She indicated that Plaintiff could lift and carry up to twenty pounds occasionally and ten pounds frequently, but that Plaintiff could only occasionally climb stairs, stoop, kneel, crouch or crawl, and could never climb a ladder, rope or scaffold. Tr. 439-40.

As a result of these physiological impairments, Plaintiff described experiencing pain when she stands for a prolonged period of time. Tr. 29. She also indicated that she cannot comfortably sit for a long time. Tr. 30. She further claims that she experiences pain in her feet when she drives a car for "a half an hour or an hour." Tr. 31. Plaintiff testified that she could only walk approximately one block at most before she needs to sit down and take a break. Tr. 39. She testified that she was unable to remain standing for longer than forty-five minutes, and unable to sit for longer than thirty minutes at a time. Tr. 39. She also indicated that she was unable to lift and carry more than ten pounds. Tr. 40.

With respect to her psychological problems, Plaintiff reported initially treating for depression as early as 1980, when she received treatment for approximately two months. Tr. 415. Plaintiff also indicates that she was hospitalized for one to two months for psychiatric problems in 1986 in Brooklyn, New York, because her marriage broke down. Tr. 494. More recently, Plaintiff sought treatment at the Cumberland County Guidance Center in 2006 and

2007, and again in 2009 and 2010.  Tr. 476-80; 606-10.  Plaintiff was diagnosed by her treating

doctors with major depressive disorder.  Tr. 606.  Her doctor also indicated that she has suffered

from anxiety, insomnia, and occasional suicidal ideas.  Id.  She has been placed on medications

for these conditions, including Vistaril, Effexor and Trazodone.  Tr. 608.

On March 27, 2007, Plaintiff was seen by Dr. Kim Arrington for a consultative

psychiatric evaluation.  Dr. Arrington noted that Plaintiff indicated that she left her last job in

2005 due to depression and had not worked since.  Tr. 415.  At the time of her evaluation with

Dr. Arrington, Plaintiff reported that she sometimes thought of suicide but "changes her mind by

thinking about religion."  Tr. 416.  At the time of that evaluation, Plaintiff traced her depressive

symptoms back to a car accident in 2002.  Id.  Plaintiff reported spending "her days watching TV

and sometimes socializing with friends."  Tr. 417.  Dr. Arrington diagnosed Plaintiff with major

depressive disorder with psychotic features, generalized anxiety disorder and "rule out

posttraumatic stress disorder."  Tr. 418.  She recommended that Plaintiff continue with her

psychiatric treatment.  Id.  Dr. Arrington indicated that Plaintiff was "able to follow and

understand simple instructions and directions," although she struggled to "maintain attention and

concentration."  Id.  She further indicated that Plaintiff "may be able to maintain a regular

structure if it is structured, and supported.  She will have difficulty learning new tasks and

performing complex tasks.  She appears able to make appropriate decisions and relate adequately

with others."  Id.

Plaintiff was also seen by Dr. Lewis Lazarus, Ph.D., of the New Jersey Division of

Disability Determination Services on June 27, 2008.  This was a consultative examination at the

request of the Administration.  Tr. 492-95.  Dr. Lazarus noted her treatment with Cumberland

County Guidance Center.  Tr. 494.  He also commented on Plaintiff's history of psychiatric treatment dating back to the 1980's.  Id.  Dr. Lazarus described Plaintiff as "friendly" and indicated that her "manner of relating and social skills were adequate."  Tr. 494.  Dr. Lazarus found that the examination results were "somewhat" consistent with her allegations, "but not entirely."  Tr. 495.  Dr. Lazarus reported Plaintiff's diagnosis as "pain disorders, associated with both psychological factors and a general medical condition," and also "Cognitive disorder, NOS."  Id.  He recommended continued treatment and follow up for her cognitive defects, as well as "a vocational assessment and rehabilitation . . . in order to assist the [Plaintiff] in finding an appropriate vocation given her noted work history and current level of functioning."  Id.  He also noted that Plaintiff "may have some difficulties with following and understanding complex instructions because of . . . memory impairments, as well as difficulties with attention."  Id.

After the evaluation of Dr. Arrington, but before that of Dr. Lazarus, Plaintiff's psychological treatment records were reviewed by Dr. Jane Curran for the purposes of completing a Mental RFC Assessment.  Tr. 434.  Dr. Curran found that claimant was "moderately limited" in several areas, particularly those relating to following instructions and concentrating.  Tr. 434-45.  Dr. Curran did not find that Plaintiff was "markedly limited" in any psychological category.  Id.  She indicated that attempts to obtain the treatment records from Cumberland County Guidance Center had been unsuccessful.  Tr. 436.  Dr. Curran concluded that Plaintiff could "make simple decisions, adapt to routine change and respond appropriately to others."  She also found that Plaintiff could "meet the basic demands of unskilled work" from a psychological perspective.  Id.

Plaintiff evidently ceased treatment with mental health professionals between July 2007 and March 2009, although she continued to take Vistaril and Effexor. Tr. 608-10. In 2009, she returned to the Cumberland County Guidance Center, and on August 17, 2009, a Dr. E. Balita, from that facility, completed an examination report indicating that Plaintiff should not work for the period from June 17, 2009 through November 30, 2009 due to her psychological impairments. Tr. 606-07.

### C. Plaintiff's Work History

Plaintiff worked as a floor worker at a costume company from 2000 through 2002. Tr. 237-38. She also reported past work as a housekeeper from 1996-1998, and 2002-2003, a pre-school teacher's assistant in 2003, a home health aide in 2004, and as a cook in 2005. Tr. 61, 224, 237. Plaintiff never had a job that did not involve being on her feet all day. Tr. 61. At the costume company, she reported picking up materials, carrying light items that weighed less than ten pounds, and standing and walking for eight hours per day. Tr. 238. As a housekeeper, she made beds, cooked meals, and helped her client dress. Tr. 224. As a teacher's assistant, Plaintiff helped the children with homework, and assisted the teacher with tasks. Tr. 239. Plaintiff worked as a cook at a fast food restaurant for five months in 2005, but states that she left because of depression. Tr. 34-35. She was required to stand all day at that job, and prepared and cooked various food items. Tr. 242. Plaintiff most recently worked as a crossing guard in for approximately one month in the winter of 2009-2010. Tr. 29. She stated that she could not continue with that job because she became scared when she was almost struck by a car, and also had pain from all the standing that she had to do in that capacity. Id.

## II.    STANDARD FOR REVIEW OF COMMISSIONER'S DECISION

District court review of the Commissioner's final decision is limited to ascertaining whether the decision is supported by substantial evidence.  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)).  Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Morales v. Apfel, 225 F.3d 310, 316 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999)).  If the Commissioner's determination is supported by substantial evidence, the Court may not set aside the decision, even if the Court "would have decided the factual inquiry differently."  Fargnoli v. Masanari, 247 F.3d 34, 38 (3d Cir. 2001) (citing Hartranft, 181 F.3d at 360).  A district court may not weigh the evidence "or substitute its conclusions for those of the fact-finder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992).

Nevertheless, the reviewing court must be wary of treating "the existence vel non of substantial evidence as merely a quantitative exercise" or as "a talismanic or self-executing formula for adjudication."  Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.").  The Court must set aside the Commissioner's decision if the Commissioner did not take into account the entire record or failed to resolve an evidentiary conflict.  Schonewolf v. Callahan, 972 F. Supp. 277, 284-85 (D.N.J. 1997) ("Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.")

(quoting Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978)). Furthermore, evidence is not substantial if it constitutes "not evidence but mere conclusion," or if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (citing Kent, 710 F.2d at 114).

## III.    DISCUSSION

The Commissioner conducts a five-step inquiry to determine whether a claimant is disabled, and therefore eligible for DIB and SSI benefits. 20 C.F.R. § 404.1520(a)(4); Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). The Commissioner first evaluates whether the claimant is currently engaging in any "substantial gainful activity." Such work activity bars the receipt of benefits. 20 C.F.R. § 404.1520(b). The Commissioner then ascertains whether the claimant is suffering from a severe impairment, meaning "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not have such a severe impairment that limits her ability to do basic work activities, the claim will be denied. Id. If the Commissioner finds that the claimant's condition is severe, the Commissioner moves to the third step and determines whether the impairment meets or equals the severity of a listed impairment. 20 C.F.R. § 404.1520(d). If the condition is equivalent to a listed impairment, then it is presumed that the claimant is entitled to benefits; if not, the Commissioner continues to step four to evaluate the claimant's residual functional capacity ("RFC") and analyze whether the RFC would enable the claimant to return to her "past relevant work." 20 C.F.R. § 404.1520(e). The ability to return to past relevant work precludes a finding of disability. 20 C.F.R. § 404.1520(f). If the Commissioner finds the claimant unable to resume past relevant work, in the fifth and final

step, the Commissioner determines whether the claimant can adjust to other work.  If the claimant has the capacity to perform other work available in significant numbers in the national economy, based upon factors such as the claimant's age, education and work experience, the claimant will be found not disabled.  20 C.F.R. § 404.1520(g).  If the claimant cannot make an adjustment to other work, she will be found to be disabled.  Id.

In his first decision, the ALJ began his analysis by finding that Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date of June 1, 2005.  Tr. 75. Moving to the second step, he found that she had severe impairments that affected her ability to do basic work activities.  Id.  He found that the severe impairments related to her physical condition, and found that her mental impairment was not severe as it did not "cause more than minimal limitation in the claimant's ability to perform basic mental work activities."  Id. Moving to the third step, the ALJ found that Plaintiff's impairment did not meet or exceed one of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  Tr. 76.  The ALJ reached a decision at the fourth step, where he determined that Plaintiff had the RFC to perform a full range of light work, which would permit her to return to her past work as a floor worker.  Tr. 76-79.  Although the ALJ did not need to make findings as to step five, he indicated that "there are other jobs that exist in significant numbers in the national economy that the claimant also can perform."  Tr. 79.

After the matter was remanded to the ALJ by the appeals council, with the direction to further evaluate Plaintiff's mental impairments, the ALJ arrived at the same ultimate conclusions at all steps of the analysis.  Tr. 12.  The ALJ again resolved the case on the grounds that Plaintiff had the RFC to return to her past work.  Tr. 18.  However, in his second decision, the ALJ

explicitly discussed Plaintiff's psychiatric disorders and treatment in detail in explaining how he determined her RFC. He indicated that she had no psychiatric treatment between July 3, 2007 and March 18, 2009, and that a progress note on November 24, 2009 indicated that Plaintiff "had '(no) complaints' and was sleeping well." Tr. 15. He observed that her Trazodone was discontinued on February 22, 2010 and there was no record of treatment since that date. Tr. 16.

The ALJ also observed Dr. Balita's opinion that Plaintiff was disabled, but discounted that opinion "because it is inconsistent with the clinical findings and diagnostic studies." Tr. 16. Specifically, the ALJ believed it was inconsistent with the progress notes, her discontinuation of Trazodone, and her cessation of treatment. Id. The ALJ also concluded, based upon the findings of Dr. Arrington, Dr. Lazarus, and Dr. Curran, that "her depression does not cause significant limitation in the activities of daily living, or any significant vocational limitations." Tr. 17. He also found that "her symptoms are not of such severity, frequency, or duration as to preclude the performance of unskilled light work which entails only simple repetitive tasks." Id. The ALJ pointed to Plaintiff's testimony that although "she feels depressed . . . her depression was under control, as she gets nervous and tense but tries to control it." Id. He observed that Plaintiff testified that she voluntarily stopped going to therapy because she did not like it. Id. He further cited her testimony that she socializes with her adult children, friends and neighbors, and helps care for her two-year old grandchild. Id.

Plaintiff claims that the ALJ erred in two ways. First, she argues that the ALJ failed to consider the opinions of the psychological experts and provide an adequate rationale for his conclusions when determining the extent of her RFC with respect to psychological impairments. Pl. Br. at 11. She thus argues that the RFC arrived at by the ALJ is not based upon substantial

evidence, and it should reflect additional psychological limitations. Second, she argues that the

ALJ's conclusion that Plaintiff can either return to past relevant work or perform alternative

work is not supported by substantial evidence. She argues that the determination that Plaintiff

can return to her past work is in conflict with the RFC stated by the ALJ, and the conclusion that

she can adjust to other work is improper because there was no testimony by a vocational expert.

Id. at 19-21. These arguments are addressed in turn.

## A.     The ALJ's Conclusion as to Plaintiff's Residual Functional Capacity was Based Upon Substantial Evidence

Plaintiff believes that the ALJ's assessment of her RFC was not based on substantial

evidence, particularly his conclusion that her psychological impairments did not cause "any

significant vocational limitations." Tr. 17. Plaintiff argues that the ALJ erred in misconstruing

and giving undue weight to the opinions of Dr. Lazarus, Dr. Arrington, and Dr. Curran, and in

improperly rejecting the opinion of Dr. Balita. With respect to all of them, Plaintiff argues that

the opinion of a treating physician such as Dr. Balita is generally entitled to more consideration

and weight than that of a one-time examiner such as Dr. Lazarus and Dr. Arrington, or a

reviewing doctor who never examined Plaintiff, such as Dr. Curran. Pl. Br. at 14. She also

argues that the ALJ improperly gave weight to the fact that Plaintiff stopped taking one of her

drugs and her testimony that she watches her grandchild. Id. at 12-13, 17. As a result, Plaintiff

does not believe that substantial evidence existed that she had the "mental ability to do basic

work activities." 20 C.F.R. § 404.1520(c).[2]

_____

[2] It is unclear whether Plaintiff also means to challenge the ALJ's findings with respect to her psychological
disorders at step two of the analysis, where he found that these disorders were not "severe." This argument is
asserted, but not discussed in detail in Plaintiff's brief, but is argued in more detail in her reply brief. See Pl. Br. at
24; Pl. Reply at 2-3. Although the ALJ found "severity" based only upon physiological disorders, Plaintiff would

The ALJ described Plaintiff's RFC as follows:

[S]he can lift and carry twenty pounds occasionally and ten pounds frequently, can stand and walk six hours in an eight hour workday, and can sit for six hours in an eight-hour workday, as required for light work . . . . Further, she retains the ability to understand, remember and carry out simple instructions, make judgments that are commensurate with the functions of unskilled work, make simple work related decisions, respond appropriately to coworkers and supervisors, and deal with changes in a routine work setting.

Tr. 13. In explaining his findings as to Plaintiff's psychological impairments, the ALJ indicated that although she suffers from depression, it "does not cause significant limitation in activities of daily living, or any significant vocational limitations." Tr. 17. He believed that the evidence supported Plaintiff's ability to perform work that involves simple tasks and does not involve a significant amount of stress. Id.

---

have nothing to gain by having the finding reversed at step two as to the psychological disorders. Plaintiff's claim was not denied at step two, and the ALJ moved on, eventually finding that the claim should be denied at step four. Even if an ALJ "erroneously conclude[s] that some of [a claimant's] other impairments were non-severe, any error [is] harmless, if the ALJ found in the claimant's favor at that step." Salles v. Comm'r of Soc. Sec., 229 F. App'x 140, 145 n.2 (3d Cir. 2007). See also Ross v. Astrue, Civ. No. 08-5282, 2010 WL 777398 (D.N.J. Mar. 8, 2010) (indicating that "where the Commissioner finds that the claimant suffers from even one severe impairment, any failure . . . to identify other conditions as being severe does not compromise the integrity of the analysis."). Because the ALJ found in Plaintiff's favor at step two, the analysis would have been no different had the ALJ found that Plaintiff also cleared the "severe" hurdle based on psychological disorders. The Court does not agree with Plaintiff's further argument in this regard that if the ALJ's finding "at Step Two is not supported by substantial evidence, then the subsequent finding of the [ALJ] as to the Plaintiff's residual functional capacity . . . is likewise not supported by substantial evidence." Pl. Reply at 2. Clearly, a finding in a Plaintiff's favor at the second step does not equate to a finding in her favor at steps four and five, or else it would not be necessary to have the fourth and fifth steps. The idea that this Court can review the ALJ's findings at step two, where the ALJ found in Plaintiff's favor, is without merit, and thus this Court will consider only the ALJ's finding in steps four and five in this Opinion.

In arriving at this conclusion, the ALJ referred to the report of Dr. Lazarus, who completed a consultative examination of Plaintiff. He summarized the findings of Dr. Lazarus as follows:

> Dr. Lazarus reported that the claimant would have difficulty maintaining attention and learning new tasks. But he also reported that her speech was fluent and clear with adequate expressive and receptive language functions; her thought processes were coherent and goal-directed with no evidence of delusions or paranoia; and her affect was appropriate. Further, her motor behavior and eye contact were both normal. Dr. Lazarus opined that vocational rehabilitation might help the claimant find an appropriate vocation, which suggests that she could do low-stress work which entails only simple, repetitive tasks.

Tr. 17. Plaintiff argues that the ALJ mischaracterized the findings of Dr. Lazarus because he did not note that Dr. Lazarus found that Plaintiff "might have some difficulties with following and understanding complex instructions because of noted memory impairments, as well as difficulties with attention." Pl. Br. at 15. She also argues that the conclusion that Plaintiff "could do low-stress jobs which entail only simple, repetitive tasks" is "an untenable leap" from what Dr. Lazarus actually found, and was a result of the ALJ "imagining what Dr. Lazarus means." Pl. Br. at 15-16. After reviewing Dr. Lazarus's report, the ALJ did not mischaracterize his findings. The ALJ is not required to quote everything in an examining physician's report. See Hur v. Barnhart, 94 F. App'x. 130, 133 (3d Cir. 2004) (the ALJ need not discuss "every tidbit of evidence included in the record."). The ALJ did, in fact, cite the opinion of Dr. Lazarus that "the claimant would have difficulty maintaining attention and learning new tasks." Tr. 17.

The finding by the ALJ that Plaintiff "could do low-stress work" involving "simple, repetitive tasks" is not a leap of logic with no rational basis, as Plaintiff argues. It is based on substantial evidence from the report of Dr. Lazarus. It seems clear that the ALJ found that such a low-stress job involving simple tasks would be appropriate because Dr. Lazarus found that she would have difficulty following complex instructions. When Dr. Lazarus recommended a vocational assessment and rehabilitation "in order to assist the claimant in finding an appropriate vocation," he envisioned Plaintiff being able to do some kind of work. Tr. 495. The ALJ's conclusion that Plaintiff could work at a low-stress job therefore has a rational basis in the findings of Dr. Lazarus.

Plaintiff similarly argues that the ALJ "left out a few" of Dr. Arrington's findings, and that "[t]he comments by the [ALJ] about [Dr. Arrington's] report are factually wrong." Pl. Br. at 14. Specifically, she argues that the ALJ did not properly consider Dr. Arrington's findings because he left out such findings as Plaintiff "struggling to maintain attention and concentration," and that she would "have difficulty learning new tasks and performing complex tasks." Plaintiff also points to the ALJ's omission of the section of Dr. Arrington's report that indicates that "[t]he results of the present evaluation appear to be consistent with psychiatric problems which may significantly interfere with the claimant's ability to function on a daily basis. Id. at 15. Again, the Court finds no error in the ALJ's failure to quote all of Dr. Arrington's findings. His decision that Plaintiff could perform simple, repetitive tasks is not inconsistent with Dr. Arrington's finding that "[v]ocationally, the claimant is able to follow and understand simple instructions and directions" and that "[s]he may be able to maintain a regular schedule if it is structured, and supported." Tr. 415.

Plaintiff further complains about the ALJ's conclusions from the assessment of Dr. Curran. She argues that Dr. Curran never examined Plaintiff, but merely reviewed her file, and at the time of the file review, did not have Dr. Lazarus's report or all of the records from Cumberland County Guidance Center. Pl. Br. at 16. She also argues that the ALJ did not mention that Dr. Curran checked a box indicating that Plaintiff would be "moderately limited" in the ability to maintain attention and concentration for extended periods of time. Id.

An ALJ may give weight to the opinions of non-examining state physicians when the administrative record supports those opinions. See Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991) (noting that there are circumstances in which an ALJ may consider opinions of non-examining state agency physicians when those opinions contradict the opinions of treating physicians). Here, the non-examining physician, Dr. Curran, found that Plaintiff "can make simple decisions, adapt to routine change and respond appropriately to others. She can meet the basic mental demands of unskilled work." Tr. 436. This was consistent with the ALJ's finding that Plaintiff could perform such basic, repetitive work. Further, her opinions are supported by other evidence in the administrative record, such as the findings of Dr. Arrington. Given the support for Dr. Curran's assessment, and the evidence that she carefully examined the evidence before her, the Court finds that the ALJ did not err in giving weight to Dr. Curran's findings. Although the ALJ, again, did not cite every part of Dr. Curran's report that Plaintiff would like to be cited, his findings are not inconsistent with Dr. Curran's opinion that Plaintiff was "moderately limited" in certain areas.

Plaintiff also believes that the ALJ improperly weighed Plaintiff's decision to stop taking Trazodone. The ALJ cites the records from Plaintiff's February 22, 2010 session with

Cumberland County Guidance Center where she discontinued this medication because the "client feels that she can do without the Trazodone." Tr. 608. Plaintiff argues that it was improper for the ALJ to consider this, because there is nothing in the record to show that she discontinued the drug because she was "better." Pl. Br. at 13. Plaintiff suggests that perhaps it was discontinued due to undesirable side effects or for some other reason.

The Court finds that the ALJ did not commit error by considering Plaintiff's discontinuation of one of her medications. There is substantial evidence in the record that Plaintiff discontinued the medication because of improvement in her symptoms. Plaintiff testified that the doctor took her off Trazodone because she was "sleeping better." Tr. 38. She also testified that she stopped going to therapy and taking the medication because "I felt better but, yes, I don't want medications because it's ruining my body." Tr. 52. Thus, although there is some suggestion that Plaintiff was concerned about some negative effect of the medication, there is substantial evidence that the primary reason that Plaintiff discontinued her medication was due to improvement in her symptoms. See also Tr. 479-80, 609-10 (reports on several occasions by Plaintiff treating doctor that she was "sleeping well.")

Plaintiff further argues that the ALJ improperly gave weight to Plaintiff's caring for her grandchild, arguing that these are "occasional activities" that "do not mean that the Plaintiff is not impaired. Pl. Br. at 17. She also states, without citing to the record "Does she watch [the grandchild] on a regular basis or does she watch him alone or without help? No." Id. The ALJ's discussion of Plaintiff's grandchild appears to be limited to two sentences in the ALJ's decision, where he wrote that "[s]he helps take care of her two-year old grandchild" and "[f]urther, she testified that she helps take care of her two-year old grandchild." Tr. 14, 17. Aside from

observing that this does not seem to be a large factor in the ALJ's decision, the ALJ did not misstate anything in those sentences. Plaintiff did testify that she watches her grandchildren. Tr. 41 ("Q: Do you ever watch them? A: Yeah, I watch them."). She also testified that at one point, going to her therapist was difficult because she had her grandson at home, suggesting that she had primary responsibility for supervising the child on some occasions. Tr. 58.

Plaintiff also argues that the ALJ ignored the opinion of Dr. Balita that Plaintiff was "disabled." She acknowledges that the ALJ is not bound by the opinion of a treating physician that a claimant is disabled. Plaintiff argues, however, that if the ALJ "disbelieves Dr. Balita, then he must base it on more than his own review of the medical evidence and not just his belief that Dr. Balita is willing to lie and deceive to benefit his patient." Pl. Br. at 13. This argument is without merit. The ALJ did not reject Dr. Balita's conclusion because he believed that Dr. Balita is a liar. He suggested that Dr. Balita's opinion was a "well-intentioned effort to help the claimant gain state benefit payments," but disagreed with it based upon all of the opinion and medical evidence discussed in this section, including Plaintiff's treatment records from Cumberland County Guidance Center and the opinions of Dr. Arrington, Dr. Lazarus, Dr. Curran, as well as Plaintiff's testimony. Tr. 17. An ALJ "need not accept an opinion of a physician—even a treating physician—if it is conclusionary and brief and is unsupported by clinical findings." Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992). The ALJ found that Dr. Balita's opinion was "inconsistent with the clinical findings," as he is entitled to do. Tr. 17.

It is clear that the ALJ's decision as to Plaintiff's RFC was based upon "substantial evidence," and not "a mere scintilla." Morales, 225 F.3d at 316. Plaintiff essentially asks the Court to weigh the evidence and determine that the weight of the evidence supports a different

conclusion than the ALJ arrived at, which is not the appropriate standard of review. Williams, 970 F.2d at 1182. The ALJ did not conclude that Plaintiff had no psychological impairment. Rather, his review of the evidence in the record as to Plaintiff's impairment is evidently the reason that he found that Plaintiff should be limited to work involving repetitive and simple tasks and little stress. With respect to Plaintiff's psychological disorders, the ALJ took into account the entire record and arrived at a decision after weighing all conflicting evidence. Thus, even if this Court would have weighed the evidence differently, it cannot disturb the Commissioner's final decision on this basis. Schonewolf, 972 F. Supp. at 284-85.

**B. Plaintiff's Ability to Return to Past Relevant Work or to Perform Alternative Work**

Plaintiff further argues that even if the ALJ was correct in determining Plaintiff's RFC, based on his own description of her vocational capacity, he erred in concluding that she is able to return to her prior work as a floor worker or to perform alternative work.

1. Plaintiff's Prior Job as a Floor Worker

If, based on a claimant's RFC, she would be able to perform the job requirements of a past work position, she is determined not to be disabled at step four of the analysis, regardless of whether any job positions are actually available in that trade or industry. 42 U.S.C. § 423(d)(2)(A). At step four, it is a plaintiff's burden to show that she is not able to perform past relevant work as it is performed both in her specific past job and in the national economy. See Andrade v. Secr'y of Health & Human Servs., 985 F.2d 1045, 1052 (10th Cir. 1993) (citing S.S.R. 82-61). Past relevant work means "work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. § 404.1560(b)(1).

The ALJ compared Plaintiff's RFC with her job duties at a previous job as a floor worker. Tr. 13, 18. In a Work History Report that Plaintiff completed, she described her employer, a company called "Ruby's" as a "costume company" and indicated that she worked there between 2000 and 2002, and wrote as a description "floor job, pick up materials like costumes, check bag." Tr. 237-38. It appears that she also described this employer as a "[s]ewing factory" during her testimony before the ALJ. Tr. 55. The ALJ found that at this job, "she stood and walked most of the day and picked up items weighing less than ten pounds, such as pieces of material. This work was unskilled and light exertionally, as she performed it." Tr. 13.

The problem with the ALJ's decision is that Plaintiff's description of her job places it outside of her ability to perform based upon the RFC assigned to her in the ALJ's decision. The ALJ found the following as to Plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the following residual functional capacity: she . . . can stand and walk six hours in an eight hour workday, and can sit for six hours in an eight hour workday, as required for light work . . . .

Tr. 13. However, he found that Plaintiff was not disabled because:

> The claimant's past relevant work as a floor worker (materials handler) did not require the performance of work-related activities precluded by the above limitations. Thus, the claimant's impairments do not prevent her from performing her past relevant work, as actually and generally performed in the national economy.

Tr. 18.

The ALJ's understanding of Plaintiff's past work as a floor worker appears to be almost entirely based upon her self-reported answers to the Work History Report that she completed on December 10, 2006. Tr. 237-44. In that document, Plaintiff indicated that she worked eight hours per day, Monday through Friday, and where asked how many total hours per day she was required to walk, she indicated "all day 8 hrs." Tr. 238. Similarly, where she was asked how many hours she was required to stand, she wrote "8 hrs." Id. There was no testimony before the ALJ about how long she was required to stand or walk at her prior job as a floor worker. See Tr. 55. The ALJ evidently considered the Work History Report in finding that Plaintiff only was required to carry items weighing less than ten pounds at her floor worker job, as this is indicated in the Report, but was not found in her testimony or elsewhere in the records. See Tr. 13, Tr. 238. He says nothing in his decision to reconcile his conclusion that Plaintiff's RFC permitted her to stand and walk for up to six hours per day with his conclusion that her past work, as actually performed, required her to walk and stand for eight hours per day. Although the ALJ summarily concluded that she could also perform her work as it is generally performed in the national economy, the decision contains no discussion of the requirements of a floor worker or materials handler job in the national economy, nor does it suggest that these jobs require less walking or standing than the job as it was actually performed by Plaintiff. See Tr. 18.[3] Because an ALJ must explicitly indicate why he rejects evidence in the record that would support a contrary conclusion, and the ALJ

_____

[3] To the extent that it is Plaintiff's burden to also show that she cannot perform the job as it is performed in the national economy, Plaintiff argues, using the Dictionary of Occupational Titles, that the job description of "materials handler," which the ALJ used in his decision, is inconsistent with Plaintiff's RFC. Pl. Br. at 20-21. This is an appropriate method of demonstrating how a job is performed in the national economy, and in any event, the Commissioner does not dispute this issue. See McQueen v. Comm'r of Soc. Sec., 322 F. App'x 240, 244 (3d Cir. 2009).

made no mention of the seeming contradiction between Plaintiff's RFC and her past job

duties, the Court cannot uphold the decision based on the Commissioner's finding at step

four that Plaintiff is not disabled.  See Adorno v. Shalala, 40 F.3d 43, 48 (3d Cir. 1994).  The

ALJ's findings at step four failed to resolve a conflict of evidence, and thus was not based

upon substantial evidence. Wallace, 722 F.2d at 1153.[4]

   2.   Plaintiff's Ability to Perform Other Jobs that Exist in the National Economy

        The ALJ's error at step four does not end the analysis, because the ALJ also made a

finding that Plaintiff can perform other jobs that exist in significant numbers in the national

economy, considering her age, education, work experience, and RFC.  This is the fifth and final

step of the disability analysis.  At this step, the burden shifts back to the Commissioner to prove

that Plaintiff can perform another job besides past work.  Smith v. Comm'r of Soc. Sec., 631

F.3d 632, 634 (3d Cir. 2010).  Unlike at step four, jobs that a claimant can perform must actually

be available in the national economy if disability status is to be denied at this step.  See 42

U.S.C. § 423(d)(2)(A).  The Social Security Agency has set forth regulations in the form of

medical-vocational guidelines, or "grids," that establish the number and type of jobs available in

the national economy for claimants with exertional impairments.  Sykes v. Apfel, 228 F.3d 259,

263 (3d Cir. 2000).  "The grids consist of a matrix of four factors—physical ability, age,

education, and work experience," and indicate, based on a claimant's qualifications, whether

work exists in the national economy that a claimant can perform.  Id.  Although the grids yield a

presumption as to whether work is available in the national economy for someone with the

---

[4] The Court notes that although Plaintiff, in her opening brief, pointed out the contradiction discussed in this section,
Pl. Br. at 21, the Commissioner did not attempt to address or explain this issue when responding to Plaintiff's
arguments related to step four of the analysis.  See Def. Br. at 14-15.

claimant's qualifications, claimants may rebut the presumption by offering evidence relating to their own abilities and evidence that the guidelines do not apply to them. Id. at 264; see Heckler v. Campbell, 461 U.S. 458, 467 (1983). The grids were developed, in part, to avoid the need for the Commissioner to rely on the testimony of a vocational expert at every hearing. Campbell, 461 U.S. at 461.

The grids are designed to assess whether work is available that a claimant can perform based only on her exertional impairment(s). Exertional means an impairment that affects the claimant's "ability to meet the strength demands of jobs." 20 C.F.R. § 404.1569a. Mental health impairments are generally considered non-exertional, although depression may affect a person's exertional capacity. See 20 C.F.R. § 404.1569a(c); S.S.R. 83-14, 1983 WL 31254 at *2 (S.S.A.). Because the "grids do not purport to answer [the] question" of whether "there are jobs in the national economy that [a claimant] can perform given his combination of impairments," an ALJ cannot determine whether a claimant with both exertional and non-exertional impairments is disabled based upon the grids alone. Sykes, 228 F.3d at 270.[5] The key issue when both types of impairments are involved is whether the claimant's "occupational base" is eroded, or diminished. Id. At 265. Erosion of the base occurs when, because of the non-exertional impairment, the pool of jobs normally available to a claimant with only the exertional impairment shrinks because of the additional impairment. Id. Typically, the additional evidence that an ALJ weighs includes the testimony of a vocational expert at the hearing before the ALJ. See Kuczewski v. Comm'r of Soc. Sec., Civ. No. 12-

---

[5] The Third Circuit recognized that other Circuits have reached different conclusions about the scope of the use of the grids when a claimant has both types of impairments. See Sykes, 228 F.3d at 268. Of course, this Court is bound to follow Third Circuit precedent.

43, 2013 WL 1007684 at *4 (D.N.J. Mar. 12, 2013) ("Since the ALJ recognized that Plaintiff has both exertional and nonexertional limitations, such vocational evidence was critical to satisfy the Commissioner's burden of proof at this stage.")

The Administration responded to Sykes when it issued an Acquiescence Ruling ("AR") in 2001 that set forth guidelines explaining how it would deal with cases involving both exertional and nonexertional impairments in jurisdictions within the reach of the Third Circuit in light of Sykes. The AR indicated that in these cases, it would either take or produce vocational evidence, or provide notice that the Administration is taking administrative notice regarding erosion of the occupational base. AR 01-1(3), 2001 WL 65745 at *4 (S.S.A.). However, the AR indicated that:

> This Ruling does not apply to claims where we rely on an SSR [Social Security Ruling] that includes a statement explaining how the particular nonexertional limitation(s) under consideration in the claim being adjudicated affects the claimant's occupational job base. When we rely on such an SSR to support our finding that jobs exist in the national economy that the claimant can do, we will include a citation to the SSR in our determination or decision.

Id.

Following Sykes and the promulgation of AR 01-1(3), the Third Circuit again spoke on the issue of agency rulemaking as a substitute for vocational expert testimony in Allen v. Barnhart, 417 F.3d 396 (3d Cir. 2005). The Third Circuit there indicated that although the Secretary may "rely on an SSR as a replacement for a vocational expert, it must be crystal-

clear that the SSR is probative as to the way in which the nonexertional limitations impact the ability to work, and thus, the occupational base. Id. at 407.[6]

Here, the ALJ relied on the "grids" to determine that Plaintiff was not disabled. Tr. 18. He applied Rule 202.21 of the grid, which indicates that an individual under age 49, limited to light work as a result of a severe medical impairment, with a high school education or greater, and "skilled or semi-skilled" non-transferrable previous work experience is not disabled. 20 C.F.R. § 404 Subpart P, App. 2. Plaintiff does not object to this Rule of the grid being applied to her, but objects that it was improper for the ALJ to base his decision entirely on the grid without taking vocational expert testimony, due to her combination of exertional and nonexertional impairments.

Here, the ALJ took no vocational expert testimony, and cited SSR 83-11, 83-12, 83-14, and 85-15 in summary fashion when determining that there are jobs that exist in the national economy that the claimant can perform. Tr. 18. Although the ALJ found that Plaintiff's depression and anxiety was not severe enough to preclude her from performing unskilled light work, he was not "crystal-clear" that any of the SSRs were probative with respect to the Plaintiff. Id. Although the Commissioner argues that Plaintiff's occupational light work base was not eroded, and therefore the ALJ did not need to take vocational expert testimony, there is no support for such a holding in Third Circuit law. This case is indistinguishable from Allen. In that case, the Third Circuit remanded to the ALJ where he made a "conclusory reference to SSR 85-15" instead of "an individualized assessment"

---

[6] Social Security Rulings ("SSRs") are published under the authority of the Commissioner and are binding on all components of the Administration. Sullivan v. Zebley, 493 U.S. 521, 531 n.9 (1990). SSRs do not have the force of law or regulations, but serve as precedent in deciding other cases when the facts are basically the same. See Allen, 417 F.3d at 402 n.3.

where the claimant asserted both physical and mental limitations.  <u>Allen</u>, 417 F.3d at 406-07.

The Third Circuit indicated that the ALJ relied "on SSR 85-15 in this instance . . . in

summary fashion . . . as though it resolves the issue.  However, SSR 85-15 is a ten-page

ruling that specifically addresses the relationship of different mental impairments to job

activity."  <u>Id.</u> at 404.  Here, the ALJ's discussion of SSR 85-15 is limited to the following

sentence:

> If the claimant has solely nonexertional limitations, section 204.00 in the Medical-
>
> Vocational Guidelines provides a framework for decisionmaking (SSR 85-15)

Tr. 18.  The ALJ's discussion of the SSR here does not appear to be applied in any way to

Plaintiff, and actually seems to be mere boilerplate language that is even more conclusory

than that contained in the decision discussed in <u>Allen</u>.  On remand, if the ALJ reaches step

five, he should consider how the specific nonexertional limitations experienced by Plaintiff

would affect her ability to perform tasks in a job available to her in the national economy,

and to what extent, if at all, the occupational base is eroded due to any nonexertional

impairments.  The ALJ may accomplish this by explaining how SSR 85-15 or other

regulations are relevant to Plaintiff's situation, or by an individualized assessment through a

vocational expert.

## III.   CONCLUSION

For the foregoing reasons, the Court will vacate the Commissioner's final decision and

remand the matter for further proceedings consistent with this Opinion.  An appropriate order

shall enter today.

Date:  12/23/2013          /s/ Robert B. Kugler
                           ROBERT B. KUGLER
                           United States District Judge